# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RIVERA L. PEOPLES, | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 3:15-cv-00666 |
| v. | ) | Judge Trauger/Frensley |
| | ) | |
| MIKE PARRIS, | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Petitioner Rivera L. Peoples was convicted of first-degree felony murder after his trial concluded on August 11, 2010. *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *1 (Tenn. Crim. App. Jan. 2017).[1] On June 20, 2012, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction. *Tennessee v. Peoples*, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584, at *10 (Tenn. Crim. App. June 2012).[2] Then, the Petitioner filed for post-conviction relief on eight claims alleging the ineffective assistance of trial counsel, as well as a writ of error coram nobis. *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *5 (Tenn. Crim. App. Jan. 2017). However, the state court rejected Petitioner's arguments. *Id*. at *11. Subsequently, the Tennessee Court of Criminal Appeals agreed with the lower court's post-conviction order, and affirmed the rejection of Petitioner's claims for relief. *Id*. at *17.

After seeking relief in Tennessee courts, Petitioner now brings this action under 28 U.S.C. § 2254 arguing that trial counsel's performance violated the Petitioner's rights under the Sixth Amendment to the United States Constitution. Docket No. 19, p. 2

---

[1] The LEXIS Reporter citation is *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 Tenn. Crim. App. LEXIS 5 (Jan. 2017).
[2] The LEXIS Reporter citation is *Tennessee v. Peoples*, No. M2010-02162-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 419 (June 2012).

For the reasons set forth below, the Undersigned recommends that Petitioner's amended petition for habeas relief by **DENIED** and **DISMISSED WITH PREJUDICE**.

## I.    BACKGROUND

In deciding Petitioner's appeal from his conviction, the Tennessee Court of Criminal Appeals summarized the facts underlying Petitioner's conviction:

> After a trial on August 9–11, 2010, the Petitioner was convicted by a Davidson County Criminal Court Jury of first degree felony murder, and he received a life sentence. On direct appeal, this court summarized the proof adduced at trial as follows:

> The evidence at trial established that Linburg Thompson ("Victim Thompson"), a fifty-three-year-old father of four, was killed on the night of December 10, 2008, while working at Ace's Market in Nashville. Gift Wilford Bonwe, another individual working at Ace's Market that evening, testified that Victim Thompson had taken out the trash, and, while Victim Thompson was outside, Bonwe heard loud noises that sounded like the slamming of the dumpster lid. As Bonwe walked toward the door, a lady rushed inside and told him that there had been a shooting outside. Bonwe then called the police. Shortly thereafter, a neighbor ran into the store and told Bonwe that Victim Thompson had been shot. Bonwe ran outside and found Victim Thompson on the ground "gasping for his life." Unbeknownst to Bonwe, the lady who reported the shooting had also been shot, and when Bonwe returned into the store, he found her crawling on the floor and asking for help.

> . . . .

> Antoinette Bell ("Victim Bell") testified that she was shot at Ace's Market on December 10, 2008. She lived within walking distance of the store, and she was at the market that night buying beer and cigarettes. Standing outside, she observed a silver car across the street and noticed two men get out of the car and walk toward the store. As one of the men walked into the store, Victim Bell asked him for a lighter. He told her that he did not have one, but as he later walked back out of the store, he handed her a lighter. At approximately the same time that the man with the lighter exited the store, Victim Thompson walked out of the store with garbage. Once Victim Thompson walked around the corner toward the dumpster, Victim Bell heard someone say, "go get the money out of the register." She then heard Victim Thompson respond, "I'm not going to get s**t, you go get it yourself." Immediately

2

thereafter, she heard shots fired near the dumpster, and she ran into the store. About a minute or so after running into the store, Victim Bell became dizzy and realized that she herself had been shot. On cross-examination, Victim Bell stated that she did not notice how many people were in the silver automobile. She did not see the face of any other individuals involved in the shooting except for the person from whom she asked for the lighter.

Trey Mosby testified that in December of 2008, he lived within close proximity to Ace's Market. On the night of December 10, 2008, he was at home and observed a silver Chevrolet Impala parked in front of his house. He noticed that there were four black males sitting in the vehicle. Two of the men in the vehicle stepped out and walked toward the store. He noticed that the vehicle's rims were not typical hubcaps but were alloy wheels with emblems. Mosby did not witness the shooting because he and his roommate left their residence right after he observed the men getting out of the vehicle.

Brian Beech testified that he lived directly across the alley from Ace's Market on December 10, 2008. At the time of the shooting, Beech was asleep at home, but he awoke to the sound of four gunshots. He jumped out of bed and ran toward the back of the house to look out the window, at which point he observed a silver Chevrolet Impala driving up the alleyway. The Impala stopped long enough for an individual to enter the back passenger seat and then continued driving up the alleyway. Beech noticed that the vehicle had a "drive-out tag," "some factory rims or some polished rims," and a "spoiler." After the car drove away, Beech walked outside and noticed that Victim Thompson was on the ground. Later, the police escorted Beech to view a vehicle which he identified as the vehicle he had seen in the alley.

Beverly Landstreet testified that on December 10, 2008, she lived next to the alley near Ace's Market. That evening, she heard some gunshots, and when she looked outside, she observed a silver Impala driving slowly up the alleyway. She called the police and spoke with officers once they arrived at the scene. Later, an officer escorted her and her roommate to a location where they identified a vehicle as the one they saw driving in the alley.

. . . .

Lieutenant Matt Pylkas, Metro Police Department ("MPD"), testified that he was working on the night of December 10, 2008. When he received the call about the shooting, Lieutenant Pylkas assisted in searching for the suspects instead of going to the scene of the incident. He received a description that the vehicle

3

was "a silver Impala with a temporary tag" and "an air foiler [sic] on the back." Shortly after reaching the Edgehill area, he observed a vehicle parked alone that matched the description received over the radio. Lieutenant Pylkas exited his vehicle to peer inside the Impala. He observed a stocking cap and some bandanas in the interior of the vehicle, and he placed his hand in front of the engine area and noticed that it was "extremely hot," indicating that the vehicle had been driven recently.

Officer George Bowton, a crime scene investigator for the MPD, testified that on the night of December 10, 2008, he responded to a call regarding a shooting at Ace's Market. As part of his responsibility at the scene, he drew a diagram depicting the scene of the shooting and the location of evidence obtained. Additionally, he collected one bullet and two shell casings as evidence. He identified the two shell casings as Winchester nine millimeter Luger cartridge casings.

Lynette Mace, MPD Crime Scene Investigations, testified that her involvement with the case included investigating the 1999 Chevrolet Impala identified by witnesses as the car used in the commission of the shooting. Her investigation included photographing the vehicle and articles located inside and obtaining those items to submit for analysis of deoxyribonucleic acid ("DNA"), gunshot residue, and fingerprints.

The State read into evidence the depositions of Officer Thomas E. Simpkins, MPD, and Officer Belinda Shea, MPD. Officer Simpkins stated in his deposition that he found fingerprints on approximately seven compact discs that he submitted for fingerprint analysis. In Officer Shea's deposition, she testified as an expert in latent fingerprint identification. She analyzed latent fingerprints submitted in this case by Officer Simpkins and Officer Mace. From the compact discs submitted, she found prints matching those of the [Petitioner] and an individual named Brian Moreland. From the prints lifted from an amplifier located in the trunk, Officer Shea matched a finger print to that of the [Petitioner]. Finally, on a box of dryer sheets, she identified prints as matching those of an individual named James Dowell. Officer Shea acknowledged that she analyzed several prints that she could not match conclusively to certain individuals. She also agreed that she could not discern the age of a fingerprint from her analysis.

Brian Moreland testified that he was involved in an attempted robbery at Ace's Market on December 10, 2008. He stated that the other individuals involved in the attempted robbery

were the [Petitioner], Dowell, and Harris. He had known these other men for approximately a few months prior to the incident, and he identified the [Petitioner] and Harris as brothers. On the night of the shooting, the four men determined that they needed some money, so they decided to drive around the area until they found a place to rob. Moreland confirmed that they were riding in the [Petitioner's] car and that the [Petitioner] was driving. They took with them gloves, hats, bandanas, and two guns, and they eventually decided to rob Ace's Market.

Moreland further testified that upon reaching the store, Dowell exited the vehicle and walked toward the store. At some point, Dowell entered the store, and the [Petitioner] listened by cell phone from the car. When Dowell left the store, the [Petitioner] drove the car up to the side of Ace's Market to retrieve Dowell. As Dowell was about to get into the car, Harris jumped out of the car. Harris confronted a man standing outside, "and when the dude swung at [Harris], [Harris] shot" the man twice. Immediately thereafter, Harris approached the front of the store, and, although Moreland could not see Harris at this point, Moreland heard another gunshot. Harris returned to the vehicle, and the four men drove away to the Edgehill Housing Development, where Harris's girlfriend lived and where Harris was staying at the time.

Moreland stayed at Harris's girlfriend's residence for a few hours, and at some point, the four men saw police surrounding the [Petitioner's] vehicle from the window. The police eventually knocked on the door, but no one answered the door. Moreland acknowledged that he had been charged with the same crime as the [Petitioner], and, although he had not been promised anything for his testimony, he hoped that his testimony would be beneficial to the resolution of his case.

On cross-examination, Moreland agreed that he never intended for anyone to get shot or hurt. He also acknowledged that, when Harris jumped out of the vehicle, Harris was acting on his own accord and Moreland did not know what Harris was doing. However, on redirect examination, Moreland admitted that all of the men were planning to get out of the car but that Harris simply jumped out of the car sooner than Moreland anticipated.

Detective Jill Weaver, MPD, testified that she interviewed approximately fifteen individuals throughout the investigation of this case, including all four individuals allegedly involved in the attempted robbery. The State played a video that consisted of Detective Weaver interviewing the [Petitioner]. In the video, the

5

[Petitioner] explained that on the night of the shooting he went to the mall with his brother in the [Petitioner's] vehicle. When they returned from the mall, he left his vehicle at his residence, and his daughter's mother picked him up and drove him to Fairview for the evening. The [Petitioner] also referred to his association in the "GD's," which Detective Weaver explained was a reference to a gang called the Gangster Disciples.

Jerome Bonsu testified that he owns an automobile dealership on Dickerson Pike. He identified a bill of sale from his company bearing the name of the [Petitioner] as the purchaser of a gray Chevrolet Impala on November 24, 2008. Bonsu confirmed that he sold the vehicle to the [Petitioner]. He also identified a reference sheet included with the [Petitioner's] file that listed phone numbers for Antonio Harris, Brian Moreland, James Dowell, and Sham[e]ka Harris [Malone]. On the bill of sale, the [Petitioner] also provided his cell phone number.

Agent Richard Littlehale, Tennessee Bureau of Investigation ("TBI"), testified as a communications analyst in crime investigations. He received phone records for the cell phone numbers of the [Petitioner], Moreland, Dowell, and Harris, which were admitted as evidence at trial. Each cell phone record included a reference to the cell tower used to transmit each call. He then calculated the distance from that tower to pertinent locations in the case. He explained that in an urban area, cell towers were approximately one or two miles apart. Calls customarily are transmitted from the cell tower that is closest to the location of the cell phone. From his calculation, a call made by the [Petitioner] at the approximate time of the shooting was transmitted from a tower point six four three (0.643) miles from the scene of the shooting.

Dr. Thomas Deering, a medical examiner and forensic pathologist with Forensic Medical Management Services, testified that he performed an autopsy on Victim Thompson.... Dr. Deering concluded that Victim Thompson died as a result of multiple gunshot wounds to the abdomen.

Cassaundra Waters testified that in December of 2008, she had been dating the [Petitioner] for about a month. She worked with Lisa Anderson, the girlfriend of Harris, and because Waters was separated from her husband at the time, she also lived with Anderson. According to Waters, on the evening of December 10, 2008, the [Petitioner] left with Harris to go to the mall. After they returned to Anderson's residence, police came to the door, but no one answered the door. Waters could not recall whether the

6

[Petitioner] spent the night at Anderson's residence that night. The next day, Waters and the [Petitioner] observed a news story on television regarding the shooting at Ace's Market. The Defendant told Waters that the [Petitioner], Harris, Dowell, and Moreland went to the store that evening with the purpose of robbing it.

Jamesia Dowell, sister of Dowell, testified that she has had a relationship with the [Petitioner] and that they had two children together. In December of 2008, she lived in Fairview. Early one morning, the [Petitioner] woke Jamesia by calling her to request that she say that he was in Fairview if anyone asked her about his whereabouts on the night of December 10, 2008. She acknowledged that he was not, in fact, in Fairview on that date.

. . . .

Agent James Russell Davis, II, TBI, testified as an expert in the field of microanalysis. He explained that when a weapon is fired, gunpowder settles on all the objects in close proximity to the weapon. He tested gloves found throughout the [Petitioner's] Impala including: one glove from the trunk, two pairs from the rear seat area, and a pair located in the glove box. From his analysis, Agent Davis discovered that there was gunshot residue on all the gloves tested.

Agent Michael Turbeville, TBI, testified as an expert in the field of DNA analysis. He tested a number of items in an attempt to discover DNA profiles on the items. On a pair of black gloves recovered from the rear passenger area of the [Petitioner's] Impala was a mixture of DNA matching Harris, Dowell, the [Petitioner], and a female. He also matched the DNA found on a black bandana in the glove box to Harris. Regarding the pair of gloves found in the glove box, one glove had DNA consistent with that of Harris and Dowell, with the possibility of Moreland and a female as additional contributors. The corresponding glove contained DNA matching that of Harris and Dowell, with the possibility of the [Petitioner] and a female as additional contributors. A black bandana from the rear passenger area of the vehicle matched the DNA of Harris and Dowell. Based on the analysis of an additional pair of gloves retrieved from the rear passenger area of the vehicle, Agent Turbeville discovered DNA on one glove consistent with that of Harris, Dowell, and Moreland, with the possibility of a match to the [Petitioner] and a female. With regard to the corresponding glove, he discovered DNA consistent with that of the [Petitioner], Dowell, and Moreland, with the possibility of Harris and a female as additional contributors. From a bandana found in a pocket in the back passenger seat, Agent Turbeville discovered DNA matching that of the [Petitioner] and Moreland.

7

Another bandana found in that pocket contained DNA consistent with that of Dowell. Agent Turbeville opined that tennis shoes found in the car matched the [Petitioner's] DNA as well as a female's DNA. A white shirt retrieved from the rear floorboard contained DNA consistent with that of the [Petitioner] and a female. Additionally, Agent Turbeville obtained nasal secretion from the shirt that matched the [Petitioner's] DNA.

. . .

The [Petitioner] took the stand and testified that on the evening of December 10, 2008, he drove to the mall with his brother, Harris, and Dowell to buy shoes for his daughter. The State asked the [Petitioner] why he did not mention to the police that Dowell went with him to the mall. He responded, "I guess, when you tell one lie, you've just got to continue. You have to build on that lie. So when you tell one lie, you've got to continue to tell another lie to cover that first one up." After returning from the mall to the Edgehill area, Harris asked to borrow the [Petitioner's] car. According to the [Petitioner], Harris, Dowell, and Moreland then left for approximately fifteen to twenty minutes. When they returned, Harris told the [Petitioner] that someone had been shot. *Tennessee v. Peoples*, No. M2010–02162–CCA–R3–CD, peop, at *1–6 (Tenn. Crim. App. June 2012) (footnotes omitted).

Thereafter, the Petitioner filed a petition for post-conviction relief, listing the following instances of ineffective assistance of counsel:

1. The failure of [trial counsel] to investigate, subpoena, and secure the attendance at trial [of] Shameka D. Harris [Malone] as an alibi witness for [the Petitioner].

2. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of the custodian of the cellular phone records for the number (615) 589–0741 to authenticate [the Petitioner's] cell phone records and calls during time periods and location in relation to the crime.

3. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of co-defendant, James Dowell, as an exonerating witness for [the Petitioner].

4. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of Joshua Ostein, as an exonerating witness for [the Petitioner].

5. The failure of [trial counsel] to object, at trial, to the playing of Detective Weaver's entire interview of Cassaundra

8

Waters.

6. The failure of [trial counsel] to request jury instructions concerning what the trial court determined to be prior inconsistent statements of Cassaundra Waters.

7. [Trial counsel] provided ineffective assistance of counsel by failing to consult with [the Petitioner] regarding the overarching defense strategy which involved [trial counsel's] unilateral decision to concede [the Petitioner's] guilt in front of the jury.

8. Subsequent to [the Petitioner's] conviction, [trial counsel] received charges via the Board of Professional Responsibility regarding three prior clients for mishandling their cases and not proceeding in a timely fashion, resulting in a suspension of his law license. In addition, on May 20, 2013, [the Petitioner] received authorization from the Board of Professional Responsibility to file formal charges against [trial counsel] for his failure to handle [the Petitioner's] case in a professional and effective manner, (including never visiting [the Petitioner] to discuss his case while incarcerated pending trial). . . .

The Petitioner also filed a petition for a writ of error coram nobis, alleging that Moreland had recanted his trial testimony and exculpated the Petitioner from any involvement in the murder. The trial court first held a hearing regarding the post-conviction claims. Immediately thereafter, the court conducted a hearing regarding whether the petition for a writ of error coram nobis was time-barred or whether due process required tolling of the statute of limitations.

At the post-conviction hearing, trial counsel testified that he discussed the charges with the Petitioner each time they went to court. Trial counsel did not recall meeting with the Petitioner at the jail. During the meetings, trial counsel tried to explain the defense strategy. Initially, trial counsel intended to pursue an alibi defense based upon the Petitioner's spending the night at Malone's house. However, "once all the proof had come out," trial counsel determined that the best strategy was to argue the Petitioner had abandoned the crime.

Trial counsel said that he and the Petitioner discussed potential witnesses and that the Petitioner told him Malone was an alibi witness. However, when trial counsel tried to contact Malone, he did not get an answer or did not "like the feel of what [he] heard." Therefore, trial counsel never filed a notice that he intended to use an alibi witness. Trial counsel said that not much

evidence existed to support an alibi defense. Regarding alibi, trial counsel said, "It's fair to say someone might have—there might be someone out there who could have said something." Nevertheless, trial counsel asserted, "If there was an alibi possibility, I would have followed up with it." Trial counsel maintained that the defense was designed to counter the State's evidence and that he did not want to present a defense that was not credible.

Trial counsel said that he learned from discovery that the State planned to introduce cellular telephone records and that he discussed the records with the Petitioner. The Petitioner told trial counsel that the telephone involved was not his; however, the Petitioner had used that telephone number on the application to buy the car that was used in the crimes.

Trial counsel said that he did not speak with the Petitioner's co-defendants but that he did speak with their attorneys. The Petitioner told trial counsel that co-defendant Dowell had written a letter stating his intention to recant his statement to the police that implicated the Petitioner; however, Dowell's attorney told trial counsel that Dowell would not recant his statement. Trial counsel said that he did not call Dowell as a witness at trial because the police had video recorded an interview with Dowell shortly after the crimes, and his testimony could have been impeached with the video.

Trial counsel said that he thought co-defendant Moreland would testify for the State against the Petitioner. Trial counsel could not recall whether he researched Moreland's criminal history to determine if any of the offenses could be used for impeachment, but trial counsel said that he normally performed such research. Trial counsel acknowledged that through discovery, he learned Joshua Ostein gave a statement to detectives regarding "[s]omething he overheard" concerning the murder. Trial counsel did not interview Ostein. Trial counsel said that Ostein's statement would not have rebutted Moreland's testimony. Trial counsel did not know whether Moreland, Dowell, Harris, or Malone had signed affidavits.

Trial counsel conceded that the Board of Professional Responsibility (BPR) had received complaints about his failure in civil cases to prepare for trial, stay in touch with clients, perform due diligence, and other claims of misconduct. Counsel further conceded that in January 2012, his license to practice law was suspended for two years. Additionally, the Petitioner had filed a complaint with the BPR, which trial counsel was disputing "very

aggressively." Trial counsel asserted that he did a "professional job" representing the Petitioner; he noted, however, that "[c]ommunication was breaking down towards the end."

On cross-examination, trial counsel said he thoroughly examined the State's proof against the Petitioner, and he informed the Petitioner the State's case was strong. The Petitioner told trial counsel at least three or four different versions of the events on the night of the offenses. During counsel's discussions with the Petitioner, "the details would evolve." Trial counsel became uncomfortable with presenting any of the Petitioner's versions of events at trial. He felt "boxed in" because he feared the Petitioner would commit perjury and advised the Petitioner against testifying. Nevertheless, the Petitioner insisted on testifying.

Trial counsel asked the Petitioner to introduce himself and to tell what happened but did not ask further questions because he did not want to suborn perjury. Trial counsel stated that the Petitioner's testimony was not corroborated by any other proof. Trial counsel "thought it would be presumptuous to think the jury would be that gullible for me to argue that fact pattern or that narrative" to which the Petitioner testified. Before trial, trial counsel had never heard the version of events to which the Petitioner testified. When faced with the Petitioner's testimony, which contradicted the Petitioner's previous versions of events, trial counsel concluded that presenting a defense of abandonment was the Petitioner's best chance to receive a lesser offense, an acquittal, or a hung jury. Trial counsel noted that one of the co-defendants had advanced an abandonment defense and obtained a mistrial due to a hung jury.

Trial counsel acknowledged that he knew about Dowell's letter recanting his statement to the police. Trial counsel said that even if Dowell had testified consistently with the recantation, the State would have introduced the video recorded interview of Dowell as a prior inconsistent statement. In the interview, Dowell stated that the defendants were in the Petitioner's car, the Petitioner was driving, and the Petitioner "was part of the robbery plan." Trial counsel opined that the timing of the interview made it more credible than Dowell's potential trial testimony.

Trial counsel said the undisputed proof at trial was that Harris had shot the clerk. Trial counsel thought that the Petitioner first mentioned four to six months after the crime that he had a cellular telephone other than the one the police investigated. Trial counsel thought that telephone companies typically did not keep

11

records for longer than six months. The Petitioner never explained why he gave the number of the cellular telephone found in the car on his application when he bought the car instead of the other cellular telephone. Trial counsel said that he was well-prepared for trial and that even with hindsight, he would not have made different choices.

On redirect examination, trial counsel said that he did not find the Petitioner's claims regarding alibi evidence to be credible, explaining:

> [W]e had two witnesses that said he asked them to lie about him being in Fairview [at Malone's house], we had his car, we had the phone number he provided on the application used in the robbery bouncing off the same towers as the other three numbers, the other three codefendants, and we had a codefendant testify.

On recross-examination, trial counsel acknowledged that the Petitioner had filed several complaints against him with the BPR. In his complaints, the Petitioner made allegations similar to those he made in his post-conviction petition.

James Dowell, a co-defendant, testified that the Petitioner had fathered children with Dowell's sister and that he had known the Petitioner since 2005 or 2006. Dowell identified a letter he wrote to trial counsel in 2009 or 2010, before the Petitioner's trial, in which he exculpated the Petitioner. The letter was admitted as an attachment to the hearing.

Dowell testified that the Petitioner was not at Ace's Market on the night of the offenses. Dowell said that he, Moreland, and Harris went to Malone's house where the Petitioner was and borrowed the Petitioner's car. Harris drove them to Ace's Market. One of the men talked on a cellular telephone during the drive, but Dowell could not remember which man used the telephone.

On cross-examination, Dowell acknowledged that after his arrest, he told the police that the Petitioner "was involved and was part of the plan to rob the Ace Market." After being indicted, Dowell spoke with a prosecutor and reiterated the Petitioner's involvement in the crimes. He provided details in the hope that he could testify for the State. Sometime before the Petitioner's trial, Dowell and the Petitioner were transported together for a court

12

date in Williamson County. Thereafter, Dowell wrote the recantation letter. Because of the letter, the prosecutor told Dowell's attorney that Dowell had breached the "deal" with the State, that he would not be used as a witness at the Petitioner's trial, and that he would be prosecuted for the offenses.

Dowell denied telling his attorney that he was forced to write the recantation letter and that its contents were not true. Dowell stated that after he wrote the letter, he no longer wanted to testify against the Petitioner. Nevertheless, after he wrote the letter, his attorney filed a motion contending that Dowell was willing to abide by the deal with the State and should not be prosecuted. Dowell asserted that he did not know why a hearing was held on the motion or why his attorney appealed the issue to the Tennessee Supreme Court.[3] He said that if he had been called to testify at the Petitioner's trial, he would have testified about his own involvement in the crime and "to this letter, that I wrote the letter."

On redirect examination, Dowell said that the State had offered a deal he could not refuse. In return for his testimony, his charges would be dismissed, and he would be released from jail. Dowell asserted that he "made up a lot of stuff just to get that deal." Dowell said that the Petitioner did not force him to write the recantation letter and that he did not discuss the letter with the Petitioner before he wrote it and sent it to trial counsel. Dowell said that he implicated the Petitioner because he had a "vendetta" against the Petitioner at the time. Once Dowell realized the seriousness of the offenses, he felt compelled to exonerate the Petitioner.

Shameka Harris Malone, the Petitioner and Harris's sister, testified that on the night of December 10, 2008, the Petitioner was at her house "[a]ll night," wrapping Christmas presents. She acknowledged that her house was a "couple of blocks" from Ace's Market but asserted that it "wasn't walking distance."

On cross-examination, Malone said that around 9:00 p.m., the Petitioner called her house and asked for her help wrapping Christmas presents. He arrived at her house around 9:15 or 9:30 p.m. and stayed until morning. She and the Petitioner were alone in

---

[3] *See* [*Tennessee*] *v. James L. Dowell*, No. M2012–00520–CCA–R3–CD, 2013 WL 1804191, at *25–26 (Tenn. Crim. App. Apr. 2013) (concerning an unrelated aggravated robbery and especially aggravated kidnapping case with Dowell and the Petitioner as co-defendants in which Dowell challenged the State's failure to honor an immunity cooperation agreement); *perm. to appeal denied*, (Tenn. Oct. 2013).

the house. She was "sure" that the Petitioner talked to Harris "and them" by telephone "[n]ot long" after the Petitioner arrived at the house. Malone said that "the others" did not "come back" to her house that night.

Malone said that a detective came to her house but did not ask her questions. Trial counsel never spoke with her, and she never told him that the Petitioner was with her at the time of the offense.

Brittany Bates testified that she talked to the Petitioner on a nearly daily basis during the four months the Petitioner was in custody awaiting trial. During almost every conversation, the Petitioner asked for her assistance in contacting trial counsel. Bates tried to deliver "papers" to trial counsel's office, but he either was not there when she went by the office or canceled their appointments. She alleged that trial counsel's secretary was in the office on only one occasion when she tried to make a delivery.

Josh Ostein testified that "[a]t some point," he overheard Moreland say:

> that he was trying to serve somebody [at Ace's Market] and they tried to take the dope from him. So, when they tried to take the dope, [Moreland] pulled out a gun and started shooting. And one of the victims that was in the way lost his life in the process of it.

Ostein said that Moreland did not mention the Petitioner when describing the incident. Ostein said that he was never asked to testify to counter Moreland's testimony.

On cross-examination, Ostein said that he was subpoenaed to testify at Dowell's trial. During a jury-out hearing, Ostein invoked his Fifth Amendment right to remain silent but was told that because he was not a defendant, he had no Fifth Amendment privilege in relation to that case. Nevertheless, Ostein asserted that he did not want to get involved, and "they let [him] go." Ostein said that at the time of Dowell's trial, he was scared that he "might end up getting involved in this."

Ostein said that when he was booked into jail on unrelated robbery charges, Detective Weaver asked him about Moreland. Ostein opined that Detective Weaver thought he knew something about the Ace's Market shooting because he was from the same area as Moreland. Ostein said that he was arrested a couple of months after the Ace's Market shooting.

14

Upon questioning by the post-conviction court, Ostein said that he did not recall testifying during a jury-out hearing at Dowell's trial that he did not know Moreland.

The Petitioner testified that trial counsel did not visit him in jail. He also testified that he never spoke with trial counsel about his case. He tried calling or writing, but trial counsel never responded. While in jail, the Petitioner asked Bates to try to contact trial counsel, but she was unsuccessful.

The Petitioner testified that he told trial counsel "through correspondence" that the telephone records used by the State to place the Petitioner at the scene of the crime were from a "prepaid phone that was used by several people"; it was not the cellular telephone registered in his name. Trial counsel told the Petitioner that pursuing the records relating to the telephone registered to the Petitioner was "a wild goose chase."

The Petitioner said that the night of the offense, he and his brother, Harris, were at Hickory Hollow Mall. After the Petitioner left the mall, he went to Malone's house to wrap Christmas presents. The Petitioner spent the rest of the night at Malone's house and let Harris borrow his car.

The Petitioner said that his car was impounded after the crime. The Petitioner said when he spoke to detectives about the car, he tried to protect people and denied that the car was his or that his brother was involved. He asserted that he did not know the lies he told to protect people would result in his being convicted of murder.

The Petitioner asserted that he wanted his defense to be that he was not at the scene of the crime. He never told trial counsel that he was present at the scene but abandoned his involvement in the crimes. He thought trial counsel's arguing abandonment essentially conceded the Petitioner's guilt in the crimes. The Petitioner said trial counsel presented the abandonment defense without first consulting him.

The Petitioner asserted that he and trial counsel did not communicate before trial. Trial counsel sent "a paralegal or an assistant" and an investigator to meet with the Petitioner, but they would not answer the Petitioner's questions. The Petitioner had never heard about criminal responsibility before the first day of trial. The Petitioner said that he was never advised of the charges against him or of the potential life sentence.

15

On cross-examination, the Petitioner said that trial counsel never informed him of any plea offers made by the State.

The State recalled trial counsel, who testified that he conveyed the State's plea offer to the Petitioner and discussed the offer with him. Trial counsel said that "it was a forty-year offer, dismiss everything else." Trial counsel said that he explained felony murder and criminal responsibility to the Petitioner.

Upon questioning by the post-conviction court, trial counsel acknowledged that the Petitioner testified that he was not present at the scene of the crime and was instead at his sister's house. He contended that he did not know what the Petitioner's trial testimony would be. Trial counsel said that he argued abandonment based on the evidence presented at trial, explaining that he thought the jury would not believe the Petitioner's testimony. Trial counsel focused on the State's burden of proof during the opening statement and on abandonment during closing argument. Trial counsel acknowledged that he hired a private investigator and that he had a "[s]ecretary slash paralegal." Trial counsel asserted that his paralegal "at that time was in the office all the time except for an hour for lunch."

Dowell's attorney, C.W., testified that Dowell's agreement with the State was "that if he testified truthfully and was honest from that point forward that he would receive substantial mercy in ... the murder case." The agreement further provided that the charges against him on "the home invasion cases" would be "dismissed or retired." C.W. recalled that Moreland had agreed to testify against Dowell. C.W. said that the State never promised that Dowell would be released "[a]t any particular time."

C.W. agreed that Dowell's "position ... changed" after he wrote the recantation letter. C.W. filed a motion to compel the State to enforce the deal regardless of Dowell's recantation letter. At a hearing on the motion, C.W. informed the court that Dowell had told the truth in his statement to the police and that Dowell was willing to testify consistently with the statement. C.W. appealed the State's failure to honor the deal, but relief was denied. C.W. thought he called Ostein to testify at Dowell's trial in order to rebut Moreland's testimony that Harris was the shooter. However, Ostein refused to testify.

Teresa Michelle Hamblen, a correctional officer, testified that she recognized a document written and signed by Moreland.

16

She first saw the document on March 6, 2013. She did not recall notarizing the document but acknowledged signing it. Hamblen said that her records reflected that the document was a letter, not an affidavit. On cross-examination, Hamblen said that she did not place Moreland under oath before he signed the document.

In support of the petition for a writ of error coram nobis, the Petitioner testified that Moreland wrote him letters apologizing for lying and implicating the Petitioner in the crimes. Moreland asked if he could do anything to help the Petitioner, and the Petitioner suggested that he "put it in writing." "[S]ometime right before" the Petitioner filed the petition for a writ of error coram nobis in May 2013, the Petitioner received an affidavit from Moreland, recanting his trial testimony. The Petitioner said that prior to trial, he did not know what Moreland's testimony would be.

The Petitioner said that his trial ended on August 11, 2010, and that his motion for new trial was denied thirty or forty-five days later. The Petitioner said that he was incarcerated and could not have obtained Moreland's recantation earlier.

On cross-examination, the Petitioner said that at the time of the hearing, he and Moreland were not housed at the same facility. They previously had been in the same prison but had not been allowed see each other because they were deemed "incompatible[]," and Moreland was in protective custody. The Petitioner said that he did not have any friends in prison take messages to Moreland. The Petitioner said that Moreland wrote three or four letters before writing the recantation.

E.H. testified that she represented Moreland in the Ace's Market murder case. She said that during the pendency of that case, she and Moreland met with the State regarding whether Moreland would testify for the State. The State never encouraged Moreland to lie. Moreland never told E.H. that the Petitioner was not involved with the murder; in fact, he said "quite the opposite." When asked if Moreland ever said the Petitioner was not involved, E.H. responded, "There was never any doubt who was involved."

E.H. said that she had been "in touch" with Moreland since the recantation document was filed. She knew that Moreland was placed in protective custody because of a concern that either the Petitioner or the Petitioner's "agents" would harm Moreland.

On cross-examination, E.H. denied that Moreland's

testimony was "crucial" to the Petitioner's prosecution, noting that the State had "a very strong case" against the Petitioner without Moreland's testimony. She noted that Moreland "never wanted to testify." E.H. advised him that testifying for the State could benefit him but that they had no deal that guaranteed any benefit. She thought Moreland originally faced a fifty-six-year sentence but eventually received a ten-year sentence.

Upon questioning by the post-conviction court, E.H. said that Moreland testified two or three times against the Petitioner and Dowell.[4] Moreland's trial testimony was consistent with what he told E.H. E.H. said that at least one month prior to trial, trial counsel knew that Moreland intended to testify for the State against the Petitioner.

The assistant district attorney general who prosecuted the Petitioner testified that Moreland testified for the State at the Petitioner's trial. The prosecutor said that he never attempted to have Moreland testify untruthfully and that he never "coach[ed]" Moreland on how he should testify. The prosecutor told Moreland that if he testified against the Petitioner, he would "take all this into account in deciding how to resolve [Moreland's] case." Moreland never told the prosecutor that the Petitioner was not involved in the crimes.

The prosecutor stated that initially, the State planned to have Dowell testify against the Petitioner. However, before the Petitioner's trial, Dowell and the Petitioner were transported together to Williamson County for a case; afterward, Dowell recanted his statement implicating the Petitioner. Because Dowell was no longer a suitable witness, the prosecutor approached E.H. about Moreland's testifying for the State. Once it was determined Moreland would testify for the State, the prosecutor informed the Petitioner's trial counsel.

On cross-examination, the prosecutor opined that Moreland's testimony was not "critical" to the State's case against the Petitioner but that his testimony was "helpful." Regarding the Petitioner's role, Moreland consistently told the prosecutor that the Petitioner was at the scene and was involved in the crime. The

---

[4] The Petitioner and Dowell were tried separately for the murder committed at Ace's Market, and Moreland testified at each trial. *See* [*Tennessee*] *v. James L. Dowell*, III, No. M2011–02096–CCA–R3–CD, 2012 WL 3939978 (Tenn. Crim. App., Sept. 2012); [*Tennessee*] *v. Rivera L. Peoples*, No. M201002162–CCA–R3–CD, 2012 WL 2356584 (Tenn. Crim. App. at Nashville, June 20, 2012)

prosecutor noted that even without Moreland's testimony, the State had ample evidence incriminating the Petitioner, including the car, the items in the car, and the cellular telephone records.

The prosecutor said that Moreland's affidavit stating the State encouraged him to lie was "upsetting" because Moreland "should have never been put in a position where he could have been influenced by either [the Petitioner] or people that were associated with [the Petitioner]." The prosecutor understood that Moreland had to "survive" in prison. The prosecutor said, "My opinion is he signed that affidavit so he could go to sleep that next night and not feel like somebody was going to hurt him and the next night and the next night until he got out of prison."

Upon questioning by the post-conviction court, the prosecutor said that he was careful when interviewing Moreland prior to trial because he did not want to suggest what Moreland should say. Moreland's statements and testimony were consistent with the other evidence the prosecutor had.

Brian Moreland was called to the stand. When asked about his affidavit recanting his testimony against the Petitioner, Moreland stated, "I don't want to testify." When asked to identify his signature on the document, Moreland responded, "I don't want to."

At the conclusion of the hearings, the trial court issued an order denying both the petition for post-conviction relief and the petition for a writ of error coram nobis. Regarding the post-conviction claims, the court found that the Petitioner failed to prove that his counsel was deficient or that the deficiency prejudiced the Petitioner. Regarding the petition for a writ of error coram nobis, the court found that the petition was not filed timely and that due process did not require tolling of the statute of limitations. . . .

*Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *1-11 (Tenn. Crim. App. Jan. 2017).[5]

## II.    PROCEDURAL HISTORY

Petitioner was tried and convicted in a Tennessee State Court for first degree felony murder. *Tennessee v. Peoples*, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584, at *7 (Tenn. Crim. App. June 2012). Thereafter, the Petitioner's conviction was appealed to the Tennessee

---

[5] After the post-conviction hearing, the Petitioner's trial counsel was subject to discipline relating to counselor's handling of the underlying criminal case at issue here. Docket No. 19, p. 6.

Court of Criminal Appeals on the basis of insufficient evidence, where the Court affirmed the conviction. *Id*. at 10. Subsequently, on June 15, 2015, a timely pro se petition for a writ of habeas corpus was filed with this Court. Docket No. 1, p. 1; Docket No. 27, p. 25. Petitioner asked this Court to vacate the convictions and his prison sentence. Docket No. 1, p. 14. He provided four grounds for relief: (1) the sufficiency of the evidence; (2) a general claim of ineffective assistance of counsel; (3) ineffective assistance of counsel due to the pursuit of an abandonment defense over an alibi defense and failure to call a rebuttal expert witness; and (4) the denial of the right for Petitioner to dismiss counsel at trial. In August of that year, this Court granted a motion for the matter to be stayed in abeyance so Petitioner could pursue further means of relief in the Tennessee state court system. Docket No. 7.

Petitioner then sought post-conviction relief in Tennessee state court where his petition was denied by the trial court. *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *11 (Tenn. Crim. App. Jan. 2017). The Tennessee Court of Criminal Appeals then affirmed the trial court's denial of post-conviction relief. *Id*. at *17. After the appearances of counsel with this Court, the case was then reopened in July of 2021 and Petitioner was allowed to amend his petition for habeas corpus relief. Docket No. 17; Docket No. 18. The amended petition lists a total of eight grounds for relief.

> (1)     "Petitioner's trial counsel was ineffective by failing to meet with him pretrial in person outside the confines of the courthouse lock-up in order to prepare a trial defense."

> (2)     "Petitioner's trial counsel was ineffective by failing to advise him on his right to testify or not testify at trial, and the risks involved in waiving his right against self-incrimination in testifying, so that [Petitioner] could make an informed choice."

> (3)     "Petitioner's trial counsel was ineffective by failing to prepare and conduct adequate and meaningful cross examinations of government witnesses."

> (4)     Petitioner's trial counsel violated [Petitioner's] protected autonomy right

by overriding [Petitioner's] desired defense objective of challenging the Government's evidence on the elements of felony murder in favor of exclusively focusing on an abandonment defense over [Petitioner's] expressed objections."

(5)     "The trial court failed to allow [Petitioner] to terminate the representation of trial counsel when it was clear at trial that there was a substantial lack of communication and conflict between counsel and defendant on defense strategy."

(6)     "Trial counsel failed to challenge admissibility of cell tower evidence."

(7)     "Trial counsel failed to investigate potential favorable witnesses and communicate with [Petitioner] regarding their potential testimony at trial."

(8)     "Sufficiency of the Evidence [*sic*]."
Docket No. 19, p. 5.

On November 13, 2023, the Tennessee Attorney General's Office filed their response to the amended petition. Docket No. 27. The state argues that of the timely arguments in the pro se petition, and those that manage to relate back to the pro se petition, none provide relief to Petitioner. Docket No. 27, p. 27.

On January 5, 2024, the Petitioner filed his reply to the State's response. Docket No. 32. Petitioner argues that claims (1) through (4), (5), and (6) all relate back to his original petition because they are based on trial counsel's "abandonment" of Petitioner at "all critical stages," Docket No. 32, p. 2. Now the matter is before this Court to determine whether habeas corpus relief should be recommended.

### III.     STANDARD OF REVIEW

Per 28 U.S.C. § 2254, a state prisoner can only petition a federal court for relief from a state court conviction through a writ of habeas corpus "on the ground that he is in custody in violation of the" United States's Constitution, laws, or treaties. 28 U.S.C. § 2254(a).

#### A.     Relation Back of Claims to Original Pro Se Habeas Petition

According to Rule 2 of the Rules Governing § 2254 Cases, a petition for habeas corpus

must: (1) specify all grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested; (4) be legible; and (5) be signed under penalty of perjury. Rules Governing § 2254 Cases. A court should "liberally construe[]" a pleading when filed by a pro se petitioner and thereby apply a "less stringent standard" than a pleading drafted and filed by an attorney. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Sixth Circuit's case law accordingly instructs courts to grant leniency toward pro se habeas petitioners. *See Franklin v. Rose*, 765 F. 2d 82, 83-84 (6th Cir. 1985) (where the Sixth Circuit panel reversed a district court's narrow construction of a pro se habeas petition despite petitioner attaching the brief to the Tennessee Criminal Court of Appeals).

The relevant part of AEDPA imposes a statute of limitations that begins running on the day after the direct review's conclusion or time seeking direct review expires. U.S.C. § 2244(d)(1)(A). The statute of limitations bars claims one year after either date. U.S.C. § 2244(d)(1). However, the statute of limitations is tolled so long as a "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

Additionally, Rule 12 of the Rules Governing §2254 Cases states that the Federal Rules of Civil Procedure apply to habeas corpus actions in so far as they do not conflict with the Rules Governing § 2254 Cases. Accordingly, the Supreme Court has recognized that Rule 15(c) applies to petitions for habeas corpus relief. *See Mayle v. Felix*, 545 U.S. 644, 659 (2005).

**B.     Exhaustion Requirement and Procedural Default**

Applicants for a writ of habeas corpus can receive relief only if one of three conditions is met. The first avenue requires the petitioner to have "exhausted the remedies available in the

courts of the State." 28 U.S.C. § 2254(b)(1)(A). The second way is to show an "absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i). The final means is to show "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(ii). The exhaustion requirement in subsection (A) allows state courts an opportunity to decide the issue before the petitioner seeks habeas relief. To meet this requirement, the petitioner must have presented the claims in his federal habeas petition to a state court "under the same theory in which it is later presented in federal court." *Pillette v. Foltz*, 824 F. 2d 494, 497 (6th Cir. 1987). Although, petitioners are allowed mere variations in their legal *theory*, so long as they are not advancing a new legal *claim*. *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987) (emphasis added).

But still, if a "prisoner fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas review of those claims, absent showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O' Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)).

### C.    Excusing Procedural Default

There must be a "fundamental miscarriage of justice" in order to excuse the procedural default of a claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Supreme Court has held that attorney error cannot serve as the basis for excusing procedural default, so long as counsel met the constitutionally required minimum performance. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In *Carrier*, the Court noted that there must be "some objective factor external to the defense impeded counsel's efforts" to follow the proper state procedures. *Id.* The Court was

23

careful not to provide an exhaustive list of such factors, but did provide two examples: (1) the factual or legal basis for a claim was not reasonably available to counsel, and (2) interference by officials made compliance impracticable. *Id*. The Sixth Circuit has also noted that a petitioner presenting new evidence of their "actual innocence" would excuse a claim being procedurally defaulted. *Hodges v. Colson*, 727 F. 3d 517, 530 (6th Cir. 2013). Overall, a petitioner must overcome a considerable obstacle to have their procedurally defaulted claim considered on its merits—show cause for failure to raise the issue on appeal with the prejudice inflicted on the petitioner. *See Coleman*, 501 U.S. at 750; *Moss v. Miniard*, 62 F.4th 1002, 1011 (6th Cir. 2023).

### D. Standard of Review for Fully Exhausted Claims

So long as claims are fully exhausted, 28 U.S.C. § 2254(d) provides for two instances where habeas corpus relief will be granted to a state prisoner petitioning a federal court. *See* 28 U.S.C. § 2254(d)(1)-(2). First, a state prisoner may be granted relief when "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Under this first instance, a state court's decision is "contrary to . . . clearly established Federal law" when the state court reaches the opposite conclusion of a Supreme Court case with facts that are materially indistinguishable. *Stojetz v. Ishee*, 892 F. 3d 175, 192 (6th Cir. 2018), *cert denied sub nom. Stojetz v. Shoop*, 139 S. Ct. 1262 (2019). Under the second instance, a state court's decision "involves an unreasonable application of federal law" when the state court correctly identifies the legal principle set out by the United States Supreme Court but unreasonably applies it to the petitioner's case. *Id*. (quoting *Henley v. Bell*, 487 F. 3d 379, 384 (6th Cir. 2007)). In this context, "clearly established federal law" only includes the holdings of the Supreme Court and excludes any dicta. *Id*. (quoting *White v. Woodall*, 572 U. S. 415, 427

(2014)).

The second avenue for a petitioner to seek relief under 28 U.S.C. § 2254 is by showing the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2). If the petitioner fails to meet this standard by clear and convincing evidence, the state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1). To receive relief, the petitioner must prove not only that there was an unreasonable determination of fact, but also that the state court relied on the determination in reaching their conclusion. *Rice v. White* 660 F.3d 242, 250 (6th Cir. 2011).

## IV.   ANALYSIS

The original pro se petition argued for four grounds for habeas relief: (1) sufficiency of the evidence; (2) "ineffective assistance of counsel for several reasons"; (3) failure of trial counsel to subject the prosecution to meaningful adversarial challenges; (4) the trial court's denial of the Petitioner's fundamental right to dispense with trial counsel.

Now, Petitioner's amended petition, drafted by counsel, raises eight claims for habeas relief: (1) trial counsel's failure to meet Petitioner outside of the courthouse lock-up to prepare the defense; (2) trial counsel's failure to advise Petitioner on his right to testify at trial and the associated risks; (3) Trial counsel's failure to prepare and conduct "adequate and meaningful" cross-examinations; (4) trial counsel's decision to pursue an abandonment defense over an alibi defense; (5) trial counsel's failure to challenge the admissibility of cellphone tower evidence; (6) trial counsel's failure to investigate potential favorable witnesses; (7) the trial court's failure to allow Petitioner to terminate his trial counsel; and finally (8) the sufficiency of the evidence against Petitioner.

**A.  Not All of Petitioner's Amended Claims Relate Back to the Pro Se Petition**

Due to needing a common set of facts to relate back, only some of the amended grounds for relief should be considered not barred by the statute of limitations. Both sides agree that the amended claims for relief must relate back to the original petition, as the applicable statute of limitations has run. Docket No. 32, p. 2. In order for the additional claims in the amended petition to be considered by this Court, they must meet Federal Rule of Civil Procedure 15(c)'s requirement of "relat[ing] back" to the original petition. Fed. R. Civ. P. 15(c)(1). The Amended Grounds (5) and (8) are not at issue here, as they are nearly identical to Pro Se Grounds (4) and (1) respectively. Docket No. 1, p. 5, 10; Docket No. 19, p. 5.

In order to relate back to the pro se petition in this case, Petitioner must show that the claims "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleadings." Fed. R. Civ. P. 15(c)(1)(B).

Even though pro se petitions are to be construed more liberally than those drafted by attorneys; *Erickson*, 551 U.S. at 94, there are still meaningful limitations imposed when conducting a Rule 15(c) analysis. *Mayle v. Felix*, 545 U.S. 644, 659 (2005); *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 850 (6th Cir. 2017). The Supreme Court in *Mayle v. Felix* provides the standard on how to relate back an amended claim to the original petition for habeas corpus. The *Mayle* Court held that Rule 15(c)(2)'s relation back requirement requires a "common core of operative facts uniting the original and newly asserted claims." *Mayle*, 545 U.S. at 659 (internal quotations omitted). As the *Mayle* Court explained, Rule 15(c) "relaxes, but does not obliterate, the statute of limitations." *Id*. Therefore, an amendment to add a claim that "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth" does not relate back to the original petition. *Id*. at 650.

26

Although *Mayle* dealt with a petitioner attempting to relate a Fifth Amendment claim back to a petition that only raised a Sixth Amendment issue, the Sixth Circuit has acknowledged that the logic still applies to cases where the amended claim is more akin to the ones raised in the initial petition. *See Watkins*, 854 F.3d at 850. In *Watkins v. Deangelo-Kipp*, the Sixth Circuit recognized the Supreme Court's warning against interpreting the language of Rule 15(c) too broadly. *Id*. There, the petitioner originally asserted that he had ineffective assistance of counsel at both the trial and appellate stages of the case. *Id*. However, the petitioner did not provide "any facts supporting the underlying ineffective assistance of counsel claim." *Id*. The claim was asserted only in general terms, noting counsel's alleged "failure to investigate and raise a defense" and "failure to perfect a competent appeal." *Id*. Later, the petitioner sought to amend his petition by specifying counsel's failure to call for a "fifth psychiatric evaluation during trial." *Id*. at 850-51. The Sixth Circuit held that the amendment did not relate back because preparing a defense for trial was a different "episode" from counsel's actions during trial. *Id*. at 850-51.

The prohibition against bringing up new episodes when relating amendments back to original petitions does not preclude a petitioner from providing more detail to claims already made. *See Cowan v. Stovall*, 645 F. 3d 815, 819. In *Cowan v. Stovall*, the Sixth Circuit recognized a proper relating back of an amended petition for habeas corpus to the original petition. 645 F.3d 815, 819. There, the petitioner filed a pro se petition that asserted her trial counsel was ineffective for "failing to interview 'willing and available' witnesses." *Id*. at 818. Then, the amended complaint specified those witnesses and described what would have been their testimony. *Id*. at 819. The *Cowan* Court recognized that the amendment "merely added more detail," and that the original and amended petitions were not different in kind. *Id*.

In this case, Petitioner argues that amended claims (1) through (4), (6), and (7) all relate

27

back to the pro se petition's second and third claim because they are all based on the ineffective assistance of counsel. Docket No. 32, p. 3. Particularly, Petitioner argues that trial counsel "abandon[ed Petitioner] in critical stages of the criminal proceedings." Docket No. 32, p. 4. It is clear these six of the claims in the amended petition and the second and third claims in the pro se petition do share a common theme of ineffective assistance of counsel. Petitioner relies on this common theme to carry the day and allow for the amendments to relate back. Docket No. 32, p. 3-4.

However, a common theme is insufficient to show a petition's amendment relates back to the original. The original petition's second claim for relief reads in full "ineffective assistance of counsel for several reasons, which denied petitioner the right to fair trial [*sic*]," and the supporting facts are no more specific. Docket No. 1, p. 6. To support this conclusory allegation, Petitioner wrote "trial counsel failed to provide competent representation and therefore violated the petitioner's guaranteed right to effective assistance of counsel under the Sixth Amendment of the U.S. Constitution." Docket No. 1, p. 6. Simply put, to allow specific and narrow instances to relate back to such broad sweeping, conclusory language would "obliterate" the statute of limitations imposed by Congress. *Mayle*, 545 U.S. at 659. Therefore, Pro Se Ground (2) cannot support the relating back of the amended claims for relief.

Similarly, relating the amended grounds for relief to the pro se complaint will depend on the language of the pro se complaint providing a "common core of operative facts uniting the original and newly asserted claims." *Mayle*, 545 U.S. at 659 (internal quotations omitted). The pro se claim reads "counsel failed to subject the prosecutions [*sic*] case to meaning for [*sic*] adversarial testing on several areas [*sic*]." Docket No. 1, p. 8. The factual support reads:

> Trial counsel's decision to pursue an abandonment defense thereby
> conceding – in front of the jury – that petitioner was in an

> automobile near the crime during the robbery/felony murder was
> unreasonable and prejudicial under generally applicable standard
> [*sic*] set out in *Strickland*; counsel's representation was further
> deficient when he failed to have an expert to rebut [*sic*] the state's
> expert witness false testimony concerning cell towers, and phone
> signals [*sic*].

Docket No. 1, p. 8. Essentially, petitioner's claim has two components. First, that trial counsel's opting for an abandonment defense violated Petitioner's Sixth Amendment rights. Second, that trial counsel's failure to procure an expert witness to rebut the state's evidence also violated Petitioner's Sixth Amendment rights.

Amended Ground (1), that trial counsel's failure to meet Petitioner outside of the courthouse violated Petitioner's constitutional rights, does not relate back. Pro Se Ground (3) pertains to trial counsel's performance *during* trial, as the factual support makes clear. Docket No. 1, p. 8. Amended Ground (1), on the other hand, deals with trial preparations, or, rather, the alleged lack thereof. Docket No. 19, p. 5. Here, like in *Watkins*, Petitioner seeks to relate a claim back despite it involving a different "episode" from the claims in the original petition. 854 F.3d at 850-51. Accordingly, Amended Ground (1) does not relate back and cannot be considered on its merits.

Amended Ground (2), similarly alleging trial counsel was ineffective by failing to advise Petitioner on the risks and contours of the right to testify at his own trial, arguably relates back. Docket No. 19, p. 5. Again, this seems to be targeting the trial preparation phase despite the original pro se petition only being based on trial counsel's performance during the proceedings. Docket No. 1, p. 8. As the Supreme Court held in *Watkins*, the use of separate "episodes" as the bases of claims precludes the relation back. 854 F. 3d at 850-51. However, one could interpret Amended Ground (2) to refer to the trial phase. Then the question becomes whether the *Mayle* standard has been met. In this more charitable light, the claim may be found to relate back. The

29

Sixth Circuit acknowledged in *Cowan* that a petitioner's amendment that "merely added more detail" to the original petition did relate back. 645 F. 3d at 819. Here, Petitioner's Amended Ground (2) arguably adds detail as to how trial counsel failed to sufficiently challenge the state's evidence. After all, a defendant taking the stand without knowing the basics about their constitutional right to testify could allow for the state to easily win their case through cross examination. To err on the side of caution, the Court will assume *arguendo* that the claim relates back to provide further review.

Amended Ground (3), which provides that trial counsel failed to adequately "prepare and conduct" cross examinations of the State's witnesses, does not relate back. Docket No. 19, p. 5. Again, the test is whether the amended ground for relief has underlying facts that create a "common core" with a ground for relief found in the original petition. *See Mayle*, 545 U.S. at 659. Here, Petitioner has a timing issue that cuts against finding a common core. The word "prepare" again indicates the crux of the issue raised in Amended Ground (3) lies in trial counsel's trial preparations, not performance. Although the amended ground includes the word "conduct," that is the natural consequence with the real issue – the failure to "prepare." Accordingly, as with Amended Ground (1), Petitioner is really taking issue with trial preparations and not trial performance. Thus, Amended Ground (3) does not relate back.

Amended Ground (4) alleges that Petitioner's "protected autonomy right" was violated by trial counsel's opting for an abandonment defense over Petitioner's "expressed objections." Docket No. 19, p. 5. Here, Petitioner clearly has established the amended ground relates back as Petitioner is simply targeting the first part of the supporting facts found in Pro Se Ground (3), which show petitioner taking issue with the abandonment defense. Docket No. 1, p. 8. Here the episodes of conduct are one in the same, Petitioner is simply bifurcating one previous episode

30

into two parts. Thus, Amended Ground (4) relates back.

Amended Ground (6) reads "trial counsel failed to challenge the admissibility of cell tower evidence." Docket No. 19, p. 5. This is an instance where the amendment partially relates back, as it simply hones in on the other part of Pro Se Ground (3). Docket No. 1, p. 8. On one hand, Petitioner cited the failure of trial counsel to call "an expert" to challenge the state's cell phone tower evidence. Docket No. 1, p. 8. Given the more lenient reading pro se petitions receive, *Erickson*, 551 U.S. at 94, and the common facts and timing of the ground for relief, this portion of Amended Ground (6) is found to relate back as well. On the other hand, Petitioner now argues that there were admissibility issues with qualifying state's witness as an expert and further Fourth Amendment implications of unreasonable searches and seizures. Docket No. 19, p. 15. To this extent, these claims are too unrelated to calling a rebuttal expert witness to meet the relate back standard set out in the case law. Accordingly, only the rebuttal expert witness portion of Amended Ground (6) relates back, while the admissibility issues of the evidence brought in do not.

Amended Ground (7) notes trial counsel's alleged failure to investigate "potential favorable witnesses and communicate with Peoples regarding their potential testimony at trial" as the basis for relief. Docket No. 19, p. 5. However, there are no grounds in the original pro se petition that provide facts similar enough in time and type to provide for relating the ground back. Not only is this ground solely focused on trial counsel's *pre-trial* behavior, unlike the entirety of the relevant parts of the pro se petition, it also differs in the type. Namely, petitioner is concerned with witnesses broadly, not the very specific cellphone tower expert witness mentioned in Amended Ground (6) and Pro Se Ground (3). Accordingly, Amended Ground (7) does not relate back to the pro se petition.

At best, the statute of limitations does not bar six of the eight grounds for relief Petitioner puts forth in the amended petition. Accordingly, the two claims that do not relate back—trial counsel's failure to regularly meet with Petitioner and investigate "potential favorable witnesses"—will not be analyzed any further. The remaining claims will be analyzed below.

### B. Petitioner Has Not Shown Sufficient Grounds for Relief

Of the grounds that successfully relate back, only two of the six claims were actually exhausted. Having determined which claims are not barred by the statute of limitations, the Court will look toward whether each claim was procedurally defaulted. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022). If the claims have defaulted, then the Court will look to see if there is a reason to excuse the default. *Id*. Then, the Court will consider the merits of the claims that are not defaulted or had the default excused. *Id*.

Failure to present the claims of error to the state appellate process results in procedural default, meaning a petitioner's grounds for relief cannot be considered by federal courts without a proper excuse. *See Rose v. Lundy*, 455 U. S. 509, 520 (1982); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Further, the claims considered must "be presented to the state courts 'under the same theory in which it is later presented in federal court.'" *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (citing *Pillette v. Foltz*, 824 F. 2d 494, 497 (6th Cir. 1987); *Prather v. Rees*, 822 F. 2d 1418, 1421 (6th Cir. 1987)).

### 1. Petitioner's Claim that Trial Counsel Failed to Adequately Prepare Him to Testify on His Own Behalf is Procedurally Defaulted and Provides No Relief

#### a. The Claim is Procedurally Defaulted

Trial counsel's failure to advise Petitioner of the intricacies of his right to testify or not testify was not exhausted and is therefore procedurally defaulted. Petitioner did not present this claim by brief to the Tennessee Court of Criminal Appeals in either the direct appeal or the

collateral, post-conviction appeal. *See* Docket No. 8; *see also* Docket No. 25-18. Thus, the state court could not consider the merits of the claim, and Petitioner cannot now use it as a basis for relief under AEDPA.

**b.    Excusing the Default**

Petitioner fails to carry his burden to excuse the procedural default. The Petitioner must show a "fundamental miscarriage of justice" in order to allow this claim for relief to be considered on its merits. *Coleman*, 501 U.S. at 750. Petitioner cites to ineffective assistance of appellate counsel to excuse procedural default. Docket No. 32, p. 5. Even so, this is not enough to excuse the procedural default. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1733-34 (2022).

Generally, an attorney's "'ignorance or inadvertence' cannot excuse procedural default." *Id*. at 1733. The Supreme Court in *Shinn v. Ramirez* held that criminal defendants will typically "bear the risk of attorney error," but there are narrow exceptions if the proceeding is one where the Constitution guarantees the assistance of counsel. *Id*. The *Shinn* Court reaffirmed the exceptions laid out in earlier cases, which allow the excuse of a procedural default if the State either "requires prisoners to raise such claims for the first time during the state collateral proceedings" or "the State's judicial system effectively foreclose direct review of trial-ineffective-assistance claims." *Id*. (citing *Matinez v. Ryan*, 566 U.S. 1, 9 (2012); *Trevino v. Thaler*, 569 U.S. 413, 428 (2013)).

The Sixth Circuit has also recognized that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014). Nevertheless, tactical disagreements and differing opinions on the proper legal standard is not always enough to excuse procedural defaults. *See Moss v. Miniard*, 62 F.4th 1002, 1010-14

(6th Cir. 2023). In *Moss*, the Sixth Circuit considered which of the two means of analyzing ineffective-assistance-of-trial-counsel claims, *Strickland* and *Cronic*, to apply in a habeas proceeding. *Id*. at 1011. There, trial counsel "attested to minimal pre-trial preparation" for an entrapment hearing scheduled by the defendant's previous counsel. *Id*. at 1005-06. The entrapment hearing resulted in a finding in favor of the state, and the prosecution went on to convict the defendant. *Id*. at 1007. Trial counsel stipulated to the entrapment hearing transcript for the bench trial, waived opening argument, and did not call witnesses. *Id*. at 1006. The state courts went on to review the trial counsel's performance under the *Strickland* standard for ineffective assistance of counsel, while the defendant sought review that utilized the more favorable *Cronic* presumption of prejudice.

Under *Strickland v. Washington*, a defendant can prove ineffective assistance of counsel by meeting two requirements. 466 U.S. 668, 687 (1984). First, the defendant must show that counsel was deficient to the extent that they "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must prove they were prejudiced by trial counsel's objectively unreasonable performance. *Id*. A court should not let hindsight influence their determination on what would be considered unreasonable conduct of a trial counsel. *Id*. at 690. Further, prejudice is shown by establishing a "sufficient probability" of a different outcome to undermine confidence in the ruling from which the defendant appeals. *Id*. at 694. Failure to show one defeats a claim for ineffective assistance of counsel. *Id*. at 687.

In contrast, after *Cronic* is invoked, a defendant receives a presumption of prejudice when there is a denial of counsel at a "critical stage of [a defendant's] trial." *United States v. Cronic*, 466 U.S. 648, 659-60 (1984). If the circumstances warrant using the *Cronic*

34

presumption, there is no inspection of the actual performance of trial counsel. There are two scenarios where the *Cronic* presumption is warranted: "(1) when the defendant 'is denied the presence of counsel at a "critical stage" and suffers "the complete denial of counsel", and (2) when '"counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (quoting *Cronic*, 466 U.S. at 659).

Petitioner argues here that the lack of pretrial communication left him effectively abandoned by his trial counsel, thereby warranting the *Cronic* presumption. Docket No. 32, p. 5. His appellate counsel's failure to recognize that is relied on by Petitioner to excuse the procedural default. Docket No. 32, p. 9. Specifically, Petitioner provided in his reply that trial counsel's "failing to properly consult with Petitioner, in all stages of litigation" serves as the basis for opting for the *Cronic* standard over the more stringent *Strickland* standard. Docket No. 32, p. 5.

Here, it is not clear that Petitioner's appellate counsel was incorrect in arguing under the *Strickland* standard, and therefore cannot provide an excuse for the procedural default. Although it is clear from the record that Petitioner's trial counsel did not visit him in jail; Docket No. 25-16, p. 29; not visiting someone in prison is not the same as abandoning a client "in all stages of litigation." *See Bell*, 535 U.S. at 695-96. As noted in the transcript from the post-conviction review hearing, Petitioner's trial counsel did in fact discuss the case with Petitioner "every time [there was] a court date." Docket No. 25-16, p. 17. Trial counsel being with Petitioner "every time" he was in court is the opposite of abandoning one's client. Even though trial counsel's performance may have been subpar, it does not rise to the level that clearly justifies the use of the *Cronic* presumption of prejudice.

Accordingly, Petitioner's post-conviction attorney's argument under the *Strickland*

standard was reasonable, does not provide an excuse for the procedural default, and Petitioner cannot seek relief on this ground.

### c.    Merits

Although the Court disagrees with the applicability of *Cronic*'s presumption of prejudice, even assuming *arguendo* that *Cronic*'s presumption is appropriate here, Petitioner is still not entitled to relief.

Even with the favorable presumption provided by *Cronic*, the first prong of *Strickland* must be satisfied. In other words, Petitioner still bears the burden in showing that, based on the record, that trial counsel was "not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Although trial counsel's performance may have been lackluster, it was not as if he was not providing counsel to his client. He met with his client and actively pursued what he believed to be the best chance of securing an acquittal for Petitioner. Accordingly, no relief on this claim is warranted.

### 2.    Petitioner's Claim that Trial Counsel Failed to Prepare and Conduct Adequate Cross Examinations Provides No Relief.

### a.    The Claim is Procedurally Defaulted

Petitioner did raise trial counsel's failure to adequately cross-examine and impeach the state's witness, Brian Moreland, in the brief for post-conviction relief to the Tennessee Court of Criminal Appeals. Docket No. 25-18, p. 27. The state court agreed with the argument put forth by the Attorney General's Office that Petitioner had waived this claim as it was raised for the first time on appeal and not in the post-conviction proceeding held by the trial court. *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *12 (Tenn. Crim. App. Jan. 2017). Accordingly, the claim is not exhausted and cannot support providing the Petitioner relief.

36

### b. Excusing Procedural Default

Again, Petitioner's only argument for excusing the procedural default is that his lawyer for the post-conviction review argued under the *Strickland* standard and not the *Cronic* standard. Docket No. 32, p. 5. However, this argument fails for the same reasons stated above—it is not clear *Cronic* is the appropriate standard, and Petitioner's appellate counsel not arguing for the *Cronic* standard cannot be considered a mistake that excuses the procedural default.

### 3. Trial Counsel's Opting for an Abandonment Defense over Petitioner's Preferred Alibi Defense Violated Petitioner's "Autonomy Rights"

### a. Exhaustion

Petitioner's post-conviction appeal argument also included trial counsel's opting for an abandonment defense over Petitioner's preferred alibi defense. Docket No. 25 attachment 18, p. 4, 25, 28; *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *9 (Tenn. Crim. App. Jan. 2017). Because the Tennessee Criminal Court of Appeals disposed of the claim on its merits, it has been exhausted and can be considered by this Court on its merits. *Id*. at *13.

### b. Merits

The merits of this claim do not support granting Petitioner relief. Petitioner cites to *McCoy v. Louisiana* for the assertion that "once a defendant communicated to the court and his attorney, strenuously objecting to counsel's proposed strategy of conceding guilt, pursuing that strategy despite defendant's objection, is incompatible with the Sixth Amendment." Docket No. 19, p. 12 (citing 584 U.S. 414, 426 (2018)).

This may be an accurate assertion of current law, but *McCoy* is not meant for retroactive application. *In re Denham*, 2022 U.S. App. LEXIS 5533, No. 21-2857, *3 (6th Cir. 2022);[6] *Christian v. Thomas*, 982 F. 3d 1215, 1225 (9th Cir. 2020); *Smith v. Stein*, 982 F. 3d 229, 235 (4th

---

[6] No Westlaw reporter citation is currently available for this case.

Cir. 2020). Therefore, Petitioner relies on caselaw that is improper for this court to apply.

Even considering the merits of the claim, Petitioner still has no relief. The majority in *McCoy* paid special attention to the state court's concern that lawyers would face an ethical dilemma if required to pursue defenses that involve entering false evidence into the record. *McCoy*, 584 U.S. at 425. In *McCoy*, the trial lawyer's "motivation for conceding guilt was not to avoid suborning perjury, but to try to build credibility with the jury, and thus obtain a sentence lesser than death." *Id*.

Further still, the *McCoy* Court homed in on a difference of goals between the trial attorney and the defendant. In *McCoy*, the defendant wanted a defense to end in an acquittal, while defense counsel sought the jury to hand down a sentence less than death. *See id*. at 426. The *McCoy* Court noted that the defendant and his lawyer were not merely having a strategic dispute, but rather "intractable disagreements about the *fundamental objective of the defendant's representation*." *Id* (emphasis added); *see also Christian* 982 F. 3d at 1225.

Here, unlike in *McCoy*, trial counsel's express reason for not using the alibi defense was to avoid suborning perjury. Docket No. 25-16, p. 32-33. Another difference between *McCoy* and Petitioner's case is that both Petitioner and his trial lawyer were pursuing the same "fundamental objective"—avoiding conviction. The defense counsel in *McCoy* was unilaterally conceding guilt as a strategic decision to mitigate the sentence that would be received and avoid the death penalty, but here trial counsel pursued the defense in order to avoid a conviction in its entirety. Even if the *McCoy* holding were the correct standard, this case still does not warrant relief.

### 4. The Trial Court's Not Dismissing Trial Counsel at Trial Violated Petitioner's Constitutional Rights

#### a. The Claim is Procedurally Defaulted

Although the argument that Petitioner was denied "his fundamental right to dispense with

38

the services of trial counsel" was brought up in the brief to the Tennessee Court of Criminal Appeals, Docket No. 25 attachment 18, p. 9, the Court disposed of the issue without addressing the merits as it was not previously argued at the post-conviction hearing. *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *12 (Tenn. Crim. App. Jan. 2017). Therefore, this claim is not exhausted and cannot be the basis for habeas relief.

      **b.**    **Merits**

Even if this court considers the claim, it does not merit relief. In the middle of trial, Petitioner requested that the trial court allow Petitioner to speak with his trial attorney over an "urgent" matter. Docket No. 25-5, p. 197. When Petitioner and his counsel returned to the well of the court, the trial judge asked if there was an issue. *Id*. Trial counsel then responded that there were "personal differences," and the judge invited Petitioner to explain the issues he was having. *Id*. Petitioner complained that he was unhappy with his trial counsel's handling of his case as Petitioner's suggestions weren't heeded and his desired witnesses would not be called. *Id*. at 198. The trial judge explained that options were limited as they were in the midst of trial, and that ultimately counsel would be making these tactical decisions as the rules of evidence and risks of perjury were important considerations. *Id*. at 198-99. The trial judge told Petitioner he may sit in court and listen to the rest of the evidence and then consult with his lawyer on what he would like to do, but most decisions are left to the lawyer. *Id*. at 199. However, the judge explained that Petitioner's choice to exercise his right to testify was ultimately his own. *Id*.

Generally, a defendant does have the right to dismiss trial counsel and represent themselves. The Supreme Court held in *Faretta v. Cal* that a criminal defendant does have a Sixth Amendment right to self-representation. 422 U.S. 806, 818 (1975). The *Faretta* Court held that, although the assistance of counsel is important to ensuring a fair trial, it is not so important

that a lawyer can be forced onto a defendant who does not want the assistance. *Id*. at 833. In order to appropriately dispense with trial counsel's assistance, the trial court must ensure the defendant is "competently and intelligently choos[ing] self-representation." *Id*. at 835. In *Faretta*¸ the defendant "*clearly and unequivocally* declared to the trial court" that he wanted to proceed pro se well before the trial began, so forcing him to be represented by counsel was a violation of his constitutional rights. *Id*. at 835-36 (emphasis added).

However, "the right to self-representation is not absolute." *Id*. at 835. Relevant to this case, courts may require the defendant's election to dismiss trial counsel and proceed pro se happen at certain appropriate times. *Martinez v. Court of Appeals*, 528 U.S. 152, 162 (2000); *Soto v. White*, No. 3:14-CV-282-DJH, 2015 WL 13745790 (W. D. K. Y. 2015) (citing *United States v. Cromer*, 389 F. 3d 662, 682 (6th Cir. 2004);[7] *United States v. Erksine*, 355 F. 3d 1161, 1167 (9th Cir. 2004).

Here, unlike in *Faretta*, the defendant did not "clearly and unequivocally" state he wished to dismiss trial counsel. Docket No. 25-5, p. 197-99. When the trial court asked about Petitioner's issue with his counsel, all Petitioner said was:

> I've been as patient as possible as I could with [trial counsel]. He's not listening to me in what I'm—in what I'm trying to present as my defense. He's not listening to any of my suggestions and he's not even trying to hear what I'm trying to say. I don't like what he's doing and the way he's representing me right now.
> . . .
> He's not even willing to call my witnesses.

*Id*. During the exchange, the trial court noted that the trial was going to proceed—meaning Petitioner would not be able to find another lawyer to represent him. *Id*. at 199. Nothing in that exchange mentions Petitioner's desire to relieve counsel. At best, there are hints of Petitioner's

---

[7] The LEXIS reporter citation is *Soto v. White*, No. 3:14-CV-282-DJH, 2015 U. S. Dist. LEXIS 176231 (W.D.K.Y. 2015).

desire to proceed pro se. However, that assumes Petitioner realized proceeding pro se was his only other option. Regardless, this is still a far cry from the clear and unequivocal standard *Faretta* instructs this court to look for. 422 U.S. at 835-36. Furthermore, Petitioner's request to dismiss counsel, if that's what was intended, was arguably untimely. Petitioner had waited until the trial was well underway and the state was part of the way through presenting their case. Docket No. 25-5, p. 196-97.

Accordingly, the claim that the trial court failed to abide by Petitioner's Sixth Amendment rights by dismissing trial counsel provides no means for relief.

**5.    Trial Counsel's Failure to Call a Rebuttal Expert Witness for the State's Cell Tower Evidence Violated Petitioner's Right to Effective Assistance of Counsel**

**a.    The Claim is Procedurally Defaulted**

Similar to the previous two grounds for relief, trial counsel's failure to procure and call a rebuttal expert to counter the state's cell phone evidence was considered waived by the Tennessee Court of Criminal Appeals as it was "raised for the first time on appeal." *Peoples v. Tennessee*, No. M2014-02139-CCA-R3-PC, 2017 WL 65634, at *12 (Tenn. Crim. App. Jan. 2017). Again, issues not disposed of on the merits by appellate courts are not considered exhausted, and thus this claim can also not serve as the basis for Petitioner's relief.

**b.    Excusing Default**

Once again, the only argument put for by Petitioner's current counsel, is that the counsel during the post-conviction, collateral review failed to recognize the correct standard. Docket No. 32, p. 5. However, as stated above, this does not excuse the procedural default in this case, and this claim provides no relief for Petitioner.

**6.    There was Insufficient Evidence to Convict the Petitioner**

**a.    Exhaustion**

41

Petitioner raised the sufficiency of the evidence underlying his conviction on his direct appeal. Docket No. 25 attachment 8, p. 8-11. The Tennessee Court of Criminal Appeals held the "State presented ample evidence for the jury to conclude that [Petitioner]" was guilty of the crimes alleged against him. *Tennessee v. Peoples*, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584, at *10 (Tenn. Crim. App. June 2012). Since the Tennessee appellate court also disposed of this issue on the merits, the claim is exhausted and this court may consider it as a ground to grant habeas relief.

### b. Merits

The Tennessee Court of Criminal Appeals in its opinion on Petitioner's direct appeal clearly establish there was sufficient evidence for a jury to return a guilty verdict against Petitioner. *Tennessee v. Peoples*, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584, at *7-10 (Tenn. Crim. App. June 2012). Specifically, the state put on evidence showing the Petitioner's car was at the scene of the crime, that Petitioner himself was at that scene, testimony of Petitioner's then girlfriend about Petitioner's admission that he had gone to the Ace's Market to rob it, and that the victim died as a result of wounds sustained from that attempted robbery. *Id*. at *9. Thus, Petitioner will not be granted relief on this claim.

## V. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that habeas corpus relief be **DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any

response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn*. 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**

43